# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DAVID WESTERLUND** and **WESTERLUND LOG HANDLERS, LLC**, <br><br> Plaintiffs, <br><br> v. <br><br> **MURPHY OVERSEAS USA ASTORIA FOREST PRODUCTS, LLC**; **MURPHY OVERSEAS U.S.A. TIMBER AND LAND DEVELOPMENT, LLC**; **MURPHY OVERSEAS U.S.A. HOLDINGS, LLC**, and **DENNIS J. MURPHY**, <br><br> Defendants. | Case No. 3:15-cv-1296-SI (LEAD) <br><br> (Consolidated with Case Nos. 3:15-cv-1072-SI and 3:15-cv-1459-SI) <br><br> **OPINION AND ORDER** |

George L. Kirklin, Stephen C. Thompson, and Kristen Chambers, KIRKLIN THOMPSON LLP, 1000 SW Broadway, Suite 1616, Portland, OR 97205. Of Attorneys for Plaintiffs.

Michael E. Haglund and Michael K. Kelley, HAGLUND KELLEY LLP, 200 SW Market Street, Suite 1777, Portland, OR 97201. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Three consolidated lawsuits arise out of business relationships between Plaintiffs and

Defendants. The Plaintiffs in the lead action are David Westerlund and Westerlund Log

Handlers, LLC ("WLH"). They are collectively referred to as "the Westerlund Parties." The

Defendants in the lead action are Murphy Overseas USA Astoria Forest Products, LLC ("AFP");

Murphy Overseas U.S.A. Timber and Land Development, LLC; Murphy Overseas U.S.A.

Holdings, LLC; and Dennis J. Murphy. They are collectively referred to as "the Murphy Parties."

Before the Court is the Murphy Parties' motion for partial summary judgment. For the reasons

that follow, the Murphy Parties' motion is granted in part and denied in part.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view

the evidence in the light most favorable to the non-movant and draw all reasonable inferences in

the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th

Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling

on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of

the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

David Westerlund and Roger Nance are, respectively, the 60 percent and 40 percent

owners of WLH.[1] WLH was in the business of procuring, processing, and selling logs for export.

---

[1] Roger Nance originally was a plaintiff in this action. He has since dismissed all of his claims.

AFP purchases logs and resells them on the international market. In January 2014, WLH and AFP entered into a written contract (the "Log Handling Agreement") under which WLH agreed to provide log handling and processing services to AFP. The Westerlund Parties allege that they also entered into an oral joint venture partnership with the Murphy Parties in approximately December 2013. At the time of the alleged oral partnership agreement, WLH was operating under a contract to provide log handling services to China National Building Materials Import and Export Corporation ("China National").[2] The Westerlund Parties allege that the written Log Handling Agreement was intended to create the false appearance of an arms-length transaction, even though the two parties were in fact working as partners at the time. According to the Westerlund Parties, this was done to deceive China National. The Murphy Parties deny the existence of any deception or secret partnership.

The Westerlund Parties assert the following claims: (1) breach of partnership agreement; (2) breach of the Log Handling Agreement; (3) breach of contract; (4) fraud; (5) quantum meruit; (6) unjust enrichment; and (7) promissory estoppel.[3] The Murphy Parties seek partial summary judgment. First, the Murphy Parties argue that the parol evidence rule bars Plaintiffs' allegations of an oral agreement inconsistent with the written Log Handling Agreement. Thus, the Murphy Parties argue, Plaintiffs' claims for breach of partnership agreement, breach of contract (which are essentially the same claims), and promissory estoppel should be dismissed.[4] Second, the

---

[2] The parties dispute whether this was an exclusive contract.

[3] The Westerlund Parties have voluntarily withdrawn their previously-asserted claims of breach of fiduciary duty, conversion, and misappropriation of trade secrets.

[4] In their reply, the Murphy Parties sought, for the first time, dismissal of the Westerlund Parties' claim for promissory estoppel. The Murphy Parties explained that they had not, at the time of filing their motion, discovered case law supporting their argument that the parol evidence rule also bars claims of promissory estoppel. "The general rule is that appellants cannot raise a new issue for the first time in their reply briefs." *Thompson v. C.I.R.*, 631 F.2d 642, 649 (9th

Murphy Parties seek partial summary judgment against all claims for lost profits alleged by Plaintiffs, arguing that such claims cannot be proven with the requisite reasonable certainty and without speculation.

## DISCUSSION

### A. Claims Relating to Alleged Secret Oral Partnership

The Murphy Parties argue that the Westerlund Parties' claims of breach of partnership agreement, and breach of contract relating to the alleged partnership agreement, rely on the Westerlund Parties' assertion that there was a secret, unwritten partnership agreement between the Westerlund and Murphy Parties. The Murphy Parties argue, first, that evidence of a secret, unwritten partnership agreement is barred by the parol evidence rule. Second, the Murphy Parties argue that, even if the Court could consider the Westerlund Parties' evidence of a secret agreement, there is insufficient evidence to create a genuine issue on the existence of such a partnership. Therefore, the Murphy Parties argue, the Westerlund Parties' claims relying on this secret, unwritten partnership agreement should be dismissed.

Despite its name, "[t]he parol evidence rule is a substantive, not an evidentiary, rule because 'it declares that certain kinds of fact are legally ineffective in the substantive law." *Wirth v. Sierra Cascade, LLC*, 234 Or. App. 740, 771 (2010) (quoting *Abercrombie v. Hayden Corp.*, 320 Or. 279, 286 (1994)). Oregon's parol evidence rule is codified in § 41.740 of the Oregon Revised Statutes ("ORS"):

---

Cir. 1980). The Murphy Parties' argument is not based on new evidence or an intervening change in the case law. The Westerlund Parties have not had an opportunity to respond in writing. Furthermore, it is not clear to the Court that the parol evidence rule automatically bars the Westerlund Parties' claim for promissory estoppel. The Court thus declines to hear this new argument. *See Cedano-Viera v. Ashcroft*, 324 F.3d 1062, 1066 n. 5 (9th Cir. 2003) ("[W]e decline to consider new issues raised for the first time in a reply brief.").

> When the terms of an agreement have been reduced to writing by
> the parties, it is to be considered as containing all those terms, and
> therefore there can be, between the parties and their representatives
> or successors in interest, no evidence of the terms of the
> agreement, other than the contents of the writing, except where a
> mistake or imperfection of the writing is put in issue by the
> pleadings or where the validity of the agreement is the fact in
> dispute. However this section does not exclude other evidence of
> the circumstances under which the agreement was made, or to
> which it relates, as defined in ORS 42.220, or to explain an
> ambiguity, intrinsic or extrinsic, or to establish illegality or fraud.
> The term "agreement" includes deeds and wills as well as contracts
> between parties.

Or. Rev. Stat. § 41.740. ORS § 42.220, in turn, provides:

> In construing an instrument, the circumstances under which it was
> made, including the situation of the subject and of the parties, may
> be shown so that the judge is placed in the position of those whose
> language the judge is interpreting.

Or. Rev. Stat. § 42.220.

"Oregon courts have never read [ORS § 41.740] in a literal manner, but have instead
'treated the statute as a codification of the common law parol evidence rule.'" *Wirth*, 234 Or.
App. at 771 (quoting *Abercrombie*, 320 Or. at 286). The Oregon Supreme Court has summarized
the parol evidence rule as meaning "that a binding, completely integrated, written agreement
supersedes or discharges all agreements, written or oral, that were made before the completely
integrated agreement, to the extent that the prior agreements are within the scope of the
completely integrated agreement." *Abercrombie*, 320 Or. at 286 (citing Restatement (Second) of
Contracts § 213(2) (1979)). Furthermore, "a binding, *partially* integrated, written agreement
supersedes or discharges all agreements, written or oral, that were made before the partially
integrated agreement, to the extent that the prior agreements are inconsistent with the partially
integrated agreement." *Id.* at 286-87s (citing Restatement (Second) of Contracts § 213(1) (1979))
(emphasis added). Thus, regardless of whether a written agreement is completely or partially

integrated, prior oral agreements may not be considered to contradict the written terms. *State ex rel. Cipriano v. Triad Mech., Inc.*, 144 Or. App. 106, 114-15 (1996) (citing *Abercrombie*, 320 Or. at 288-91 for the proposition that "the court need not address the question of whether an integrated writing is completely or partially integrated after finding that the asserted parol evidence is inconsistent with an express term of the writing").

As an initial matter, "[t]he parol evidence rule does not prohibit the introduction of evidence extrinsic to a writing when the writing is not an integrated agreement." *Abercrombie*, 320 Or. at 287. An agreement is integrated if "the parties intended [it] to be a final expression of some or all of the terms of the agreement." *Id.* (citing Restatement (Second) of Contracts § 209 (1979)). This is "a question of fact for the court," for which a court may rely on all relevant evidence, including parol evidence. *Id.* at 288. The Westerlund Parties concede that the Log Handling Agreement was at least partially integrated.

The parties dispute, however, whether the Log Handling Agreement was fully or only partially integrated. Regardless of whether it was fully or partially integrated, extrinsic evidence may not be admitted if it contradicts the terms of a written agreement. The Murphy Parties argue that the alleged secret, oral partnership agreement contradicts the Log Handling Agreement because the Log Handling Agreement expressly disclaims the creation of a partnership, which the Westerlund Parties argue was the subject of the purported oral agreement.[5]

---

[5] The Westerlund Parties suggest that because, under Oregon law, two parties may form a partnership without an express intent to do so, and even while disclaiming any intent to do so, a court must look to all the surrounding circumstances in determining whether an oral partnership was formed. That is not the question, however, at this juncture; the question is simply whether the alleged oral agreement contradicts the explicit terms of the written Log Handling Agreement.

The Log Handling Agreement states: "It is not the intent of the parties to create a partnership or joint venture hereunder and no party to this agreement shall contend to the contrary." The Agreement's integration clause provides:

> This agreement contains the entire agreement of the parties hereto with respect to the Astoria Forest Products logs that WHL will receive, process, store and transport for Astoria Forest Products and supersedes all prior understandings and agreements of the parties with respect to the subject matter hereof.

The Westerlund Parties seek to present evidence that there was, in fact, a separate oral agreement that WLH and AFP would carry on as partners.

Both the disclaimer of any creation of a partnership and the integration clause are written in narrow terms. As the Westerlund Parties argue, the use of the word "hereunder" in the partnership disclaimer narrows the disclaimer to the creation of a partnership *under the written agreement itself*. This does not necessarily exclude the creation of a separate partnership. The integration clause, similarly, integrates the parties' agreement *with respect to the AFP logs that WHL will receive, process, store, and transport for AFP*. Thus, if (and only if) the secret, oral partnership agreement alleged by the Westerlund Parties relates to AFP logs that WHL was to receive, process, store, and transport for AFP, the oral agreement is inconsistent with the written agreement and barred by the parol evidence rule.

For purposes of determining whether the alleged oral agreement is inconsistent with the terms of the Log Handling Agreement, the relevant elements of the alleged oral agreement and its formation must be considered. The oral partnership that the Westerlund Parties allege was discussed first in the spring of 2013 and again in November and December of that year. According to the Westerlund Parties, in late December 2013, Westerlund, Nance, and Dennis Murphy, Sr. agreed to create a joint venture in the future. As explained by David Westerlund, the Westerlund Parties and the Murphy Parties had an "agreement to agree." According to David

Westerlund, under the joint venture agreement "AFP and WLH would start an enterprise sharing profits buying and selling logs and timberlands for its own account, as well as transporting, processing, and freighting logs aboard ship for itself and others." Before they could do that, however, WLH needed to remove itself from its contractual relationship with and obligations to China National. The parties anticipated that this would result in a legal dispute between WLH and China National. In the meantime, the Murphy Parties agreed to pay all of the Westerlund Parties' legal fees relating to the anticipated legal dispute. According to the Westerlund Parties, the Murphy Parties also agreed to finance improvements to the pier where the work of the future joint venture would take place. Also according to the Westerlund Parties, after the anticipated dispute with China National was resolved, Westerlund and Nance would begin to receive $21,000 and $16,000 per month, respectively, as "salary." Further, according to the Westerlund parties, the Murphy Parties would own 70% of the future joint venture, and the Westerlund Parties would own 30%.

Also according to the Westerlund Parties, the written Log Handling Agreement was signed deceptively to create the appearance of an arms-length transaction between WLH and AFP, rather than reveal they were working together as partners. According to the Westerlund Parties, this was done in an attempt to prevent China National from successfully suing the Murphy Parties for tortious interference with contract. David Westerlund stated in his deposition that the Log Handling Agreement "was a way to operate until [WLH] got through the separation with [China National]." He added that the Log Handling Agreement was intended to govern the relationship between WLH and AFP until the China National dispute was resolved.

The Westerlund Parties argue that because the alleged secret, oral side agreement related to ownership of a new, separate company, which would buy and sell its own logs as well as

process and transport logs for others, this oral joint venture agreement involved an entirely different subject matter and does not, therefore, contradict the Log Handling Agreement. The Murphy Parties, on the other hand, frame both the Log Handling Agreement and the alleged secret, oral partnership agreement as relating to the same subject matter: the acquisition, handling, and export of logs through the Port of Astoria.

Arguably, to the extent that the alleged oral agreement was that the two parties would form a more definite agreement—and form a partnership—*after* resolution of the China National matter, and that agreement had not otherwise been finalized, then the purported oral agreement related to something other than the specific content of the written agreement. But, the purported oral agreement to move forward as partners after the end of the China National dispute still involved the same general subject matter as the Log Handling Agreement. The Westerlund Parties propose a very narrow interpretation of the subject matter of the Log Handling Agreement—that it applied only to the specific logs that would be owned by AFP and that WHL—*as WHL*—would handle. The Westerlund Parties argue that, because the companies eventually would be part of a joint venture—and WHL would no longer perform work after the effectuation of the oral partnership agreement—the purported oral agreement did not relate to the same subject matter as the Log Handling Agreement. The Westerlund Parties' description of the Log Handling Agreement elevates form over substance.

Even if the parties were to create a new entity, that entity would be doing the same thing as what the written Log Handling Agreement covers: receiving, processing, storing, and transporting logs for sale. Additionally, the Log Handling Agreement does not contain a termination clause, suggesting that the parties envisioned an ongoing relationship. Furthermore, Westerlund states that the entire purpose of the Log Handling Agreement was to create the false

appearance of an arms-length relationship, when in fact there was none—in other words, to sign

an agreement inconsistent with the purported secret partnership that the parties had already

formed. According to the Westerlund Parties, the Log Handling Agreement was intended to

govern the parties' relationship only until the resolution of the China National matter, which

again suggests that evidence of a contrary relationship is inconsistent with the Log Handling

Agreement's written terms. Therefore, the purported oral agreement contradicts the terms of the

written agreement.

The Westerlund Parties also argue that Roger Nance and David Westerlund were not

parties to the Log Handling Agreement, and thus the integration clause purporting to integrate

the agreement with respect to the parties—*i.e.*, WLH and AFP—does not apply to Nance and

Westerlund, who allegedly were the parties on one side of the purported secret, oral agreement.

The Murphy Parties respond that Roger Nance and David Westerlund were, in fact, parties to the

Log Handling Agreement.

The first section of the Log Handling Agreement reads:

> THIS Agreement is entered into this 13th day of January, 2014, by
> and between WESTERLUND LOG HANDLERS, LLC, a
> Washington limited liability company ("WLH"), Roger Nance, Jr.
> ("Nance") and David Westerlund ("Westerlund") (collectively
> hereinafter sometimes referred to as "Guarantors") and MURPHY
> OVERSEAS USA ASTORIA FOREST PRODUCTS, LLC, an
> Oregon limited liability company ("Astoria Forest Products").

Although the contract states that Nance and Westerlund (and, perhaps even WLH, based on the

contract's language) are sometimes referred to as "Guarantors," it unambiguously identifies

WLH, Roger Nance, and David Westerlund as the actual parties on one side of the agreement.

Thus, the integration clause includes both David Westerlund and Roger Nance, as individuals.

The Westerlund Parties also argue, citing *Abercrombie*, that an integration clause only

excludes agreements reached *before* the signing of a written contract, not evidence of any

agreements reached *after* the written contract. From this proposition, the Westerlund Parties conclude that evidence that the parties "affirmed" the existence of the earlier oral agreement *after* signing the Log Handling Agreement is admissible. *Abercrombie*, however, did not involve any "affirmation" of an alleged earlier oral agreement. *See Abercrombie*, 320 Or. at 292, n. 12. Further, in *Abercrombie*, although the court noted that the parol evidence rule excludes only evidence of agreements reached before or contemporaneous with a writing, it also explained that evidence of agreements reached after a writing may not be introduced to create ambiguity in an otherwise unambiguous writing. The Westerlund Parties offer no other support for their theory that evidence of "affirmation" of an earlier-reached oral agreement is admissible to the same extent as evidence of an agreement that is reached, in the first instance, *after* a written agreement. Nor do the Westerlund Parties point to what evidence, exactly, indicates "affirmation" in this case.

The Westerlund Parties also rely upon the second half of ORS § 41.740, which references ORS § 42.220 and explains that courts may consider extrinsic evidence in construing an agreement. As the Murphy Parties note in response, however, ORS § 42.220 relates to evidence offered for the purpose of interpreting a contract. The Westerlund Parties offer evidence of a prior, inconsistent oral agreement. The evidence offered by the Westerlund Parties does not aid the court in interpreting the terms of the actual, written Log Handling Agreement. Thus, ORS § 42.220, and the portion of ORS § 41.740 that references it, are irrelevant. Because the Court concludes that the parol evidence rule bars the admission of evidence of an earlier oral partnership agreement between the Westerlund Parties and the Murphy Parties inconsistent with the Log Handling Agreement, the Westerlund Parties' claims of breach of partnership agreement

and breach of contract (to the extent the purported contract is the alleged oral, secret partnership agreement) are dismissed.

## B. Lost Future Profits

The Westerlund Parties seek to recover lost profits based on the following claims that remain: (1) fraud; (2) unjust enrichment; and (3) promissory estoppel. The Murphy Parties move to dismiss all requests for lost profits contained in each of these claims, arguing that plaintiffs cannot prove lost future profits with the requisite reasonable certainty.

### 1. Lost Profit Damages are only Proper Under Plaintiff's Fraud Theory

"In Oregon, it is well recognized that promissory estoppel is not a 'cause of action' in itself, but is a subset of and a theory of recovery in breach of contract actions." *Neiss v. Ehlers*, 135 Or. App. 218, 227-28 (1995). Under Oregon law:

> The term promissory estoppel has been used to refer to two separate concepts. The courts have recognized that actions taken in reliance on a definite promise may serve as a substitute for consideration "even though the action was not bargained for by the promissor and was not performed as an agreed exchange for the promise." When promissory estoppel serves as a consideration substitute, the plaintiff is entitled to the usual contractual remedies. We also have recognized that promissory estoppel may be used when a party acts in reliance on an indefinite promise to create a binding obligation but that only reliance damages may be appropriate in that instance.

*Staley v. Taylor*, 165 Or. App. 256, 261 n. 5 (2000) (citations omitted).

In the pending dispute, the Westerlund Parties' claim of promissory estoppel is not predicated on an assertion of reliance as a consideration substitute. They have alleged a mutual exchange of promises, which constitutes consideration. The alleged secret, oral contract is not unenforceable for lack of consideration but instead because it violates the parol evidence rule. Thus, the Westerlund Parties' claim of promissory estoppel falls under the second category. The Westerlund Parties allegedly acted in reliance on an indefinite promise to create a binding

obligation. This theory, however, permits recovery of only reliance damages, not expectation damages, and lost profits falls under the classification of expectation damages. Similarly, the Westerlund Parties cannot recover lost profits under a theory of unjust enrichment. The Westerlund Parties' damages, if any, under an unjust enrichment theory would be measured by "the unjust benefit that [the Murphy Parties] deriveds, rather than the loss [the Westerlund Parties] suffered." *Evergreen W. Bus. Ctr., LLC v. Emmert*, 354 Or. 790, 796 (2014)

### 2. Standards

Under Oregon law, which governs this dispute, in order "to recover for lost profits or sales, a plaintiff must prove these damages with 'reasonable certainty.'" *Willamette Quarries, Inc. v. Wodtli*, 308 Or. 406, 412 (1989) (quoting *Buck v. Mueller*, 221 Or. 271, 282-83 (1960)); *see also Tadsen v. Praegitzer Indus., Inc.*, 324 Or. 465, 471 (1996). This "is not a demanding standard." *Tadsen*, 324 Or. at 472. In defining "reasonable certainty," Oregon courts have relied upon a passage from McCormick, Damages 100, § 27 (1935): "It appears that the epithet '*certainty*' is overstrong, and that the standard is a qualified one, of 'reasonable certainty' merely, or, in other words, of 'probability.'" *Id.* (quoting McCormick, Damages 100, § 27 (1935)) (emphasis in original and correction omitted). "Lost profits or sales . . . are not provided merely by testimony of unverifiable expectations of profits." *Willamette Quarries*, 308 Or. at 412 (citing *Meader v. Francis Ford, Inc.*, 286 Or. 451, 458 (1979) and *Feeney & Bremer Co. v. Stone*, 89 Or. 360, 378 (1918)). An economic damages claim "necessarily rests on some quantum of evidence that would allow the jury to find that certain events probably would have occurred, or that certain conditions probably would have existed, had it not been for a defendant's wrongful conduct." *Tadsen*, 324 Or. at 472. In short, "the essential ingredient of proof of lost profits to a reasonable certainty is supporting data." *Hardwick v. Dravo Equip. Co.*, 279 Or. 619, 625 (1977) (quoting *Verret v. Leagjeld*, 263 Or. 112, 115 (1972)).

The parties dispute whether a record of past profits is required to make out a claim of lost future profits. The Murphy Parties argue that "a plaintiff with no 'reliable record of profits' will not be permitted to put a speculative lost profits claim to the jury," citing *Buck*, 221 Or. at 283, and *Douglas Constr. Corp. v. Mazama Timber Prod.'s, Inc.*, 256 Or. 107, 114-15 (1970). The Westerlund Parties respond that "'a past history of successful and profitable operation of the business' is not necessary for recovery of lost profits," quoting *Schafer v. Sunset Packing Co.*, 256 Or. 539, 544 (1970).

There is some support for the Murphy Parties' argument. In *Douglas*, the Oregon Supreme Court cited *Buck v. Mueller* for holding that "[i]f [a] business has not operated long enough to establish a reliable record of profits, the jury will not be permitted to speculate upon the probable success of the particular business alleged to have been harmed." 256 Or. at 114 (quoting *Buck*, 221 Or. at 283). The court then concluded that, because in *Douglas* "no evidence was offered that plaintiff had ever made a profit on any previous road construction job, much less that it had established a reliable record of profits," plaintiff's lost profits claim "must be considered as uncertain and speculative, and must be denied." *Id.* at 114 (quotation marks omitted). But, the court's holding in *Douglas* was narrow:

> We hold . . . that the amount of alleged profits must . . . be proved with 'reasonable certainty' and that this rule has not been satisfied where proof of at least some supporting data is admitted to be a 'simple matter,' and where there is no evidence that the business has earned such a profit in the part [sic], particularly where the business is speculative in nature in the sense that whether any profit is made on any particular contract will depend upon many intangible factors.

*Id.* at 115.

There is a lack of clarity with respect to whether a record of past profits is necessary for a claim of lost profits. In *Schafer v. Sunset Packing Co*., decided the same year as *Douglas*, the

Oregon Supreme Court discussed *Buck v. Mueller* but reached a slightly different

conclusion. 256 Or. at 544-45. In *Schafer*, the court noted that "[o]ne of the means which may be

used to establish the loss is a showing of a past history of successful and profitable operation of

the business," citing *Buck. Id.* at 544. The court went on to observe, however, "we did not say in

that case that it was the *only* wa[y] that loss of profits could be established or that it would be

fatal to plaintiff's case if he did not show that the business had an established history of

successful and profitable operation." *Id.* (emphasis added).

The more recent rule followed in Oregon courts is that the failure to "provide any

evidence that [Plaintiff] had operated profitably in the past is not fatal." *Lawrence v.

Underwood*, 81 Or. App. 533, 540 (1986). As the Oregon Supreme Court stated in *Willammette

Quarries*: "Loss of future profits may be established by proof of past profits of an established

business, [*Buck*], *or* by expert projections based upon tests performed under substantially similar

conditions. [*Hardwick*, 279 Or. at 622-25]." 308 Or. at 412 (emphasis added). The more

important point is that evidence supporting lost profits claims must amount to more than just

"unverifiable expectations of profits." *Id.*

As the Oregon Supreme Court has explained: "Generally when a plaintiff asserts a claim

for damages for future harm, the question whether those damages are recoverable is a question of

fact for the jury, the answer to which will depend on the evidence adduced at trial." *Tadsen*, 324

Or. at 472 (quoting *Zehr v. Haugen*, 318 Or. 647, 657-58 (1994)); *see also City of Eugene v.

Monaco*, 171 Or. App. 681, 688 (2000) (stating same proposition, quoting *Zehr v. Haugen*, 318

Or. 647, 659 (1994)). A "court should intervene to take the issue of lost profits from the jury

'only when it can say that the evidence is clearly insufficient to establish the claim of lost

profits.'" *Kimball v. Little River Lumber Co.*, 44 Or. App. 497, 502 (1980) (quoting *Welch v.

*U.S. Bancorp Realty & Mortg. Tr.*, 286 Or. 673, 704-05 (1979)); *see also Evergreen Int'l Airlines, Inc. v. Asiana Airlines*, 136 F. App'x 95, 98 (9th Cir. 2005) (citing the same proposition). The Oregon Supreme Court has further explained: "This does not mean that the court should withdraw the question just because the court might not be convinced by the evidence." *Welch*, 286 Or. at 705. Rather, "[i]f reasonable men could be persuaded of the validity of the claim on the evidence presented, the jury must be allowed to make the decision." *Id*.

### 3. Evidence

In support of their assertion that the Westerlund Parties cannot prove lost future profits with reasonable certainty, the Murphy Parties first point to a declaration and report by Dr. Philip Tedder ("Tedder"), a forest economist. Tedder analyzed log export data from parts of Oregon and Washington spanning 1980 to 2015 and concluded that "total export log demand is extremely variable in total and on a country-by-country basis." Tedder opines in his declaration that "the potential for strong profits by any operator of the log export terminal at the Port of Astoria is extremely uncertain," and that "the business environment for the operator of the log export terminal at the Port of Astoria is extremely risky." Tedder adds that "[t]his risk is only compounded by the fact that the Port of Astoria is a very minor player in the business of log exports from the Pacific Northwest."

The Murphy Parties also rely on the declaration of Mr. Dan Hollingshead ("Hollingshead"), a certified public accountant. Hollingshead reviewed WLH's tax returns and financial statements for the years 2009 through 2013, documents related to three business relationships of which WLH was a part, and a report by Mr. Michael E. McCoy ("McCoy") prepared on behalf of the Westerlund Parties. Hollingshead characterizes WLH's financial performance between 2009 and 2013 as "extremely poor." He finds that "lack of capital, excessive debt load and consistent losses reveal WLH to be a financially weak company with an

unsustainable business." Hollingshead calculated losses for the 2009, 2010, and 2011 tax years. In 2012, as Hollingshead explains, WLH experienced a taxable gain, which in part was due to a relief of debt owed. In 2013, WLH had taxable income, but its debt was still large and it defaulted in December of 2013.

Hollingshead analyzed three different business relationships that WLH was involved in, with three different parties: (1) International Veneer Company ("IVC"); (2) China National; and (3) AFP. The IVC deal involved a partnership between IVC and WLH. IVC invested in WLH but, according to Hollingshead, found the business to be unprofitable, and lost its investment. According to Hollingshead, IVC ultimately left the partnership after several years of WLH losing money, and IVC discounted its debt, which constituted taxable income to WLH. Hollingshead states that this discounted debt converted what would have been a loss of $212,570 in 2012 into a net profit of $177,430 in taxable income. The China National relationship involved a log handling deal between China National and WLH. China National, Hollingshead explains, "had to discount its $3,830,078 debt receivable from WLH by $1,280,078 and settled for a payment from AFP for the benefit of WLH totaling $2,550,000." The AFP relationship is at issue in this case. AFP paid China National $2,550,000. AFP experienced a net loss of $5,257,637 in the year ending December 31, 2014, and a net loss of $1,842,833 in the year ending December 31, 2015. Hollingshead adds that, based on the declaration of Mr. Robert Moon and associated documents, AFP suffered a net loss of $1,091,905 in the year ending December 31, 2016.

The Westerlund Parties also refer to McCoy's report and the documents McCoy relied on in developing his report. The Westerlund Parties point to a profit and loss statement indicating that WLH had substantial net profit in 2014. The Murphy Parties contest this fact; according to the Murphy Parties, WLH suffered a substantial *loss* in 2014. Further, the Murphy Parties assert

that the Westerlund Parties' basis for this claim—Mr. Westerlund's declaration—is not authenticated by an accountant, arguing that it does nothing more than "suggest" that WLH might have earned a profit in 2014. As the Westerlund Parties point out, however, the profit and loss statement on which Mr. Westerlund bases his statement itself came from AFP, after an accountant for WLH requested the document.

The Westerlund Parties also dispute the conclusions drawn from Hollingshead's declaration. First, the Westerlund Parties point out that "WLH's partnership with IVC failed only because IVC's lender terminated its line of credit and called its outstanding loan for reasons wholly unrelated to WLH." Second, the Westerlund Parties note that AFP's attorney, Michael Esler ("Esler"), "determined that [China National] had breached its contract with WLH to the latter's significant financial detriment and directed WLH to terminate that contract in a letter he helped draft." Third, the Westerlund Parties note that "AFP actually realized a profit on the sale of logs to which WLH was entitled." McCoy's report concludes: "Sufficient data is not readily available to determine the future value of AFP (i.e. further information is needed for the breakdown on the consolidated financial statements as well as updated information)."

### 4. Discussion

Viewing this evidence in the light most favorable to the Westerlund Parties, the Murphy Parties have not shown that the evidence is clearly insufficient for the Westerlund Parties to establish a claim of lost profits. As discussed above, the absence of a history of profits is not necessarily fatal to a claim for lost future profits. In the absence of such proof, a party may recover "if they otherwise provide[] evidence which prove[] their losses to a reasonable certainty." *Lawrence v. Underwood*, 81 Or. App. 533, 540 (1986); *see also Schafer*, 256 Or. at 545 ("Loss of profits will not be denied even though plaintiff does not rely on a past history of profitable operations if they are established by other factual data to a reasonable certainty.").

The facts of *Douglas* are not dissimilar to those in this case. In *Douglas*, a road construction contractor sued a logging operator for breach of an oral contract that provided that the plaintiff would remove rock from two quarries and would load, haul, spread and compress the rock on a timber access road. 256 Or. 107, 108 (1970). The trial court awarded lost profits damages. As the Oregon Supreme Court explained:

> The only evidence offered by plaintiff on this issue was the testimony of its president, who had been engaged in such work for 31 years and who testified that at the time of the termination of the contract, after hauling 8,000 cubic yards of rock, at least 14,000 cubic yards would have been required to complete the contract and that "we would have made a profit if we had done the job of approximately 60 cents per yard."

*Id.* at 108-09. The court noted that "[n]o evidence was offered to show either the actual or estimated cost of completing the contract, either as a whole or for each of the various operations involved"; that "no evidence was offered to show the amount of previous profits, if any, made by plaintiff on other operations, much less on other similar operations"; that "it was admitted that plaintiff suffered a loss in placing the initial 8,000 cubic yards of gravel"; and that "[t]here was also uncontradicted evidence that the weather was extremely bad during the period in question, with both rain and snow, and that weather is related to 'the expense involved in the rocking of a roadway.'" *Id.* at 108-10.

The question presented to the court in *Douglas* was:

> [W]hether the opinion of an experienced contractor that a profit of 60 cents per cubic yard of gravel would have been made on 14,000 cubic yards of gravel if plaintiff had been permitted to complete the contract, unsupported by evidence of actual costs or other supporting facts, is alone sufficient to support a verdict and judgment for alleged loss of profits, particularly in a case in which plaintiff concedes that "it would have been a simple matter" to provide such an "itemization" as "may have been required."

*Id.* at 110. The answer, the court held, was no. The court also noted that it "must recognize that the business of a logging road contractor is 'highly speculative in nature' and whether any profit or loss is made under any particular contract will depend upon many intangible factors, such as the effects of weather and the particular terrain involved, among others." *Id*. at 113.

Although the evidence of lost profits is not overwhelming in this case, more evidence is presented than was before the court in *Douglas*. Unlike in *Douglas*, the Westerlund Parties rely not only on Westerlund's opinion testimony, but also on a profit and loss statement showing that WLH made a profit in 2014. Thus, there is "supporting data," which was not present in *Douglas*. Although the Murphy Parties argue that other, similar business relationships of WLH's resulted in losses as well, the Westerlund Parties argue that the underlying causes of those losses were not attributable to WLH's own performance. Finally, *Douglas* did not involve a summary judgment motion, but rather an award of lost profits based on a trial record.

This case more closely resembles *Smith v. Abel*, 211 Or. 571 (1957), where the Oregon Supreme Court "held that there was sufficient evidence of lost profits to go to the jury in a case in which the owner of a sawmill testified that he would have made a profit of $10 to $12 per thousand on rough lumber." *Douglas*, 256 Or. at 113 (interpreting *Smith*). In *Smith*, "such 'supporting data' as was available was offered in evidence, including the profit and loss statement of the business, as well as the testimony of an accountant." *Id*. In *Smith*, although "[t]he evidence . . . suggest[ed] some doubt as to whether the sawmill would have yielded profits at all had delivery of logs continued," the plaintiff had testified to his profit on rough lumber based on the price of lumber at the time, and "it was for the jury to weigh that testimony against the other evidence." *Smith*, 211 Or. at 591. At this time, the Court cannot say that a reasonable juror could not conclude that WLH is entitled to lost profit damages on its fraud claim.

### C. Profits under the Log Handling Agreement

Separate from their claim of lost future profits, the Westerlund Parties also seek profits allegedly owed to them under the Log Handling Agreement. The Westerlund Parties allege that they are owed approximately $700,000 as their 30 percent profit share for logs that were handled by WLH. The Murphy Parties move to dismiss the Westerlund Parties' claim to these damages on the ground AFP did not in fact realize any profits.

The Log Handling Agreement provides:

> [AFP] will pay WLH $107 mbf ("MBF Payment") within ten (10) business days of receipt of the logs by WLH for its services hereunder. In addition, [AFP] will pay WLH 30% of the net profits, if any, calculated on a fully allocated tax basis, that are realized by [AFP] upon sale of the logs within ten (10) days of receipt of payment by [AFP] ("Percentage Payment").

As evidence of profits, the Westerlund Parties rely on Section 2.7 of McCoy's report. The Westerlund Parties assert that McCoy's report and related documents show that WLH realized a profit of $2,204,484 on log sales, to which WLH was entitled to 30 percent.

The Murphy Parties argue that AFP did not earn any profits between 2014 and 2016. Robert Moon, the Chief Financial Officer for AFP and a certified public accountant, stated in his declaration that McCoy's estimate of profits was incorrect because it was not calculated in a manner consistent with the terms of the Log Handling Agreement. Moon opines that AFP lost money in every year of its operation, including 2014.

The Westerlund Parties argue that, under the Log Handling Agreement, AFP's obligation to pay WLH 30 percent of net profits realized upon sale of the logs *within ten days* could not have been contingent upon AFP realizing a profit at the end of the year. The Court agrees. Whether or not AFP experienced an overall loss or profit in a given *year* is unrelated to WLH's claim that it is owed a specific percentage payment under the Log Handling Agreement. Thus,

the Murphy Parties' motion to dismiss the Westerlund Parties' claim for $700,000 under the Log Handling Agreement is denied.

## CONCLUSION

The Murphy Parties' Motion for Partial Summary Judgment (ECF 85) is GRANTED in part and DENIED in part. All that remains for trial are the Westerlund Parties' claims for breach of the Log Handling Agreement, fraud, quantum meruit, unjust enrichment, and promissory estoppel. The Westerlund Parties may seek lost future profits on their fraud claim only, but may seek lost past profits under the Log Handling Agreement.

**IT IS SO ORDERED**.

DATED this 29th day of January, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge